Good morning, Your Honors. My name is William Conte and I represent the Appellant Alliance Communications Technologies in this case. Your Honors, I would like to take 10 to 15 minutes in the first portion of my argument and then reserve 5 minutes for rebuttal, if I might. Your Honors, this is a case that involved the interpretation of a written agreement between AT&T and Alliance Communications for the sale of business telephone services. I spent a great deal of time in my opening brief addressing the facts, putting in citations to the record. I don't intend to go through all of those facts again. What I would like to do is get to the heart of what the dispute was in this case, and that is the interpretation of the word PIC, P-I-C, as it related to this agreement. The trial court below found that the word PIC meant switch a customer's service. Therefore, they interpreted the agreement to say that Alliance was only entitled to a commission on a sale if, in fact, a customer line switched their service to AT&T. Now, at trial, AT&T presented the expert testimony of a woman by the name of Dorothy Susser, and Ms. Susser testified at trial that PIC, P-I-C, in the industry had two meanings. One of which was a noun and referred to primary inter-exchange carrier. The other of which is used as a verb, which means to switch your service. In this case, the agreement between the parties specifically defined PIC as a noun. And I refer the court to excerpt of record page 41, which is page 2 of the written agreement, paragraph 2A. In the agreement, it says as follows, and by the way, this is under the description of services that Alliance is to provide to AT&T, what we are bound to do in order to earn our commission. It says as follows, contractor agrees to use its best efforts in selling ACC's product line to prospective customers, including having each such customer authorize the selection of ACC as the customer's primary inter-exchange carrier parent's, quote, PIC, close parents. In this contract, the word PIC was used as a noun, not as a verb, not indicating that the customer had to switch their service. Indeed, if you go through the agreement, there is nowhere in the agreement where the word switch is used. Well, it says that it has to be in accordance with ACC's PIC authorization procedures. That is correct, Your Honor. Correct. And once again, PIC authorization procedures is defined. It is defined as complying with AT&T. AT&T and ACC are used interchangeably in this. It was a division of AT&T, so that if I say AT&T, I don't mean to be confusing. I understand. AT&T had a protocol by which we had to give the data to them in order for them to submit the sale to the local exchange carrier to switch the customer over. In essence, it was two phases. One, we make the sale to the customer. The customer authorizes the switch of their service in a telephonically recorded statement that's made to the third-party verification company hired by AT&T. Once that third-party verification is complete, a report is sent to AT&T and to Alliance. Where does it say those are the only ACC authorization procedures? At ER page 41, Your Honor, where it says that contractor, us, Alliance, is going to A, have the customer authorized selection, and small number two, ACC's procedures. Parents, such authorization shall here and after be referred to as PIC authorization. I understand that, but where does it say that ACC procedures are only what you just said? That was the testimony at trial, Your Honor. ACC's procedures at trial are reflected in the testimony of Mr. Harwood that is referenced in the record and cited in the statement of facts. Are you saying that AT&T agreed that the only procedure was that you submitted to this verifier? That's what they testified. Is that your statement? Mr. Harwood testified that the ACC's procedures were us uploading the information into their database. The third-party verification company who verifies the sale sends the same information to Alliance and AT&T. In order to submit the sale for the actual switch of the customer's account, you have to have all of the information that goes with that customer's account, including the correct address, their main billing telephone number, their secondary working telephone numbers, and any other lines associated with that. We then, according to the protocol that AT&T gave to us, would upload that information to them, and at that juncture, we had completed the PIC authorization procedure. We were complete. Alliance had no further participation in the sale. We didn't participate, and that's an undisputed fact that's in the record, in the testimony of the parties. We had nothing to do with switching the service over on the local exchange carrier level. We had no contact with the local exchange carrier. To further illustrate this. Well, obviously, it wasn't of much value to AT&T unless they got the customer, right? Well, Your Honor, that's the misconception because this is a unique contract. This is, in the telemarketing business, it's authorization. Once the customer authorizes the switch of their service, the customer doesn't have to do anything else. Nobody has to do anything else except the manual switch of that service. So AT&T was paying us for authorized sales. To get customers to switch over. Correct, and that is why. But if they didn't complete the switch, AT&T doesn't get anything. You're just saying they will pay you to make the sale, and that's the end of it. Once again, let me illustrate why that's not correct. Because in this particular case, we're talking about the distinction. The fine line here is accounts, lines within a customer account. AT&T could get the customer and have them on their long-distance service, but because AT&T didn't have the ability to provide local service, which is what this whole contract was about. This was about selling local service to businesses that AT&T didn't have the ability to sell at that time. Those customers' lines could not be switched because, for example, AT&T didn't have the hardware, the lines running to their offices. AT&T didn't have the facilities in order to do that. And if we look in the present-day environment, how has AT&T accomplished getting that local service? Well, they've purchased companies such as SEC Global, where you have the entirety of their system, and now they can provide the local service. But it was an important fact that there were local lines, 19,916 local lines that were sold. The undisputed testimony was the vast majority of those, with the exception of a small number, were associated with a business telephone number, a BTN customer, that did in fact switch, and that the local service couldn't be provided by AT&T for reasons wholly beyond our control. So what AT&T was banking on was that if we get a verified sale from these customers, we're going to be able to switch over their local service to our service. Whether there was an expectation of some fallout or otherwise, our job was complete when we delivered a verified sale and successfully completed the PIC authorization procedure by uploading our information to them and turning over the sale. One other very important item, looking at the vernacular here, AT&T, once we had the third-party verified sale and we delivered the information to them, they denoted these as accepted. These were accepted sales orders at that point. That's an undisputed fact. We have both the testimony and the documents that show the number of accepted orders. What AT&T is saying at this juncture is that they want to be able to accept those under the terms of this agreement, but then reject them because they couldn't provide the service for some reason. And so I completely understand when you look at this facially, it doesn't seem to make sense. Well, if they never got the customer, why should they have to pay for the sale? Number one, they did get the customer in many instances. And number two, that was what they agreed to do. You say that there weren't any issues of fact except damages here, based on what you're saying, that there was no ambiguity in the contract and therefore the court should have found as a matter of law that you're entitled to cover damages. Yes, sir. I am saying that there was no ambiguity in the agreement with respect to the payment terms. And I think that if you look at each of the paragraphs that both parties have cited in this case, you see replete, authorization, authorization, authorization. The third-party verification report is me saying, I authorize to switch my service, and they record me so that I can't come back later and say, why did you switch my service? I never agreed to that. I authorize that. Compensation payable to Alliance in this case, at paragraph 26 in the agreement, at ER page 47, says that the amount of compensation to be paid here under shall be determined exclusively by the report generated by the third-party verification service being utilized by ACC. If the actual switch was the criteria, why would they not have used the reports that come from the local exchange carrier, the LEC? There was testimony from Mr. Willick, their systems engineer, that they were different reports. Once they sent their sales or sent the verified sales to the LEC to switch, the LEC would report back and say, this one can't switch or we're not switching this or this one won't switch. If the criteria for payment was switch, why wouldn't we have used those reports? Well, that's easy, because at least they have an answer to it, correct? I understand your why not, but the reason is they said, you guys didn't want to wait for the 30 or 60 days that it took to do the switch. You wanted your payment when you had gone through these other two steps. And they said, fine, we'll pay it on invoices that way, but if it doesn't switch, then we'll take it off the bills later. And you guys said, fine, they say. And your people seem to have played the game that way up until the time this thing fell apart. And your president even seemed to say, yep, that's the deal, let's try to change it. So it sounds like PIC authorization possibly meant more than those first two steps. Yes, and I'm glad the court raised that, because I do recognize areas in this case where there's difficulty, and that is one of them. I would like to say, first of all, that if you look at the distinction in the early invoicing that was sent by Alliance to AT&T, there was a phraseology put in there for PIC rejects. The testimony of Mr. Harwood, who was the individual responsible for the invoicing, indicated when he was putting that on those early bills, that meant upfront rejects out of OTIS. OTIS is the order system database. That's what he says, but that's not necessarily what your opponents say. Your Honor, I understand that. And you're saying what he says is golden, even though you lost in the district court, correct? Recognizing I lost in the district court. Well, but that's only important because of our standard of review. I agree. So he says it meant this and it meant that and it meant something else, and PIC authorization only meant X, Y, Z. And they said, no, it meant something else. And if you have a doubt, Judge, if you have a doubt of what it meant, look how he played the game. And the judge says, yep, I see how you played the game. You say, yep, but Mr. Harwood said I wasn't playing the game that way. Yes? We weren't playing the game on a level playing field at that point, Your Honor. When Mr. Harwood testified, he was the individual who was preparing those invoices. He would know why he put that down. Secondly, he didn't testify as to what the contract said or what he thought it said because he frankly said he didn't know. His job was just to prepare the invoice. But third and most important, when the large number of PIC rejects came up in May, which is approximately six months into the party's program, it was at that juncture that AT&T said to Alliance, either you will put these customers that didn't switch as PIC rejects or we will not pay your invoice. Now, Alliance is a small company. They factored these sales through a third party. They had already paid the money up front 30 days prior to this invoicing even coming up. That's a bunch of evidence. That's a bunch of talk. You've got the thing from, was it Mr. Yamashita? Yamashiro. Yamashiro. It clearly indicates we want to change the way of doing this from the way we've been doing it. Now, you say, well, yeah, but they were under stress and all this. We're at the appellate level. That was at the district court level. You had a chance to tell the district court all that, and the district judge didn't buy it. I take it. I don't think that the district court – let me step back one second first. The letter from Mr. Yamashiro was September of 2001, Your Honor, after the program was in a phase of termination. They had already stopped accepting orders. Mr. Yamashiro was proposing an alternative means in order to keep the program alive. He was not saying this is what the contract means and this is what we mean insofar as that. What is this? Okay, I might be looking at it the wrong way. I'm looking at a letter that looks like it went, let's see, from Mason. That's – he's the one, right? That is correct, Your Honor. And that's dated June 27, 2001. It's not dated September. I apologize for the date difference, Your Honor, but termination is. Well, it might make a difference in this case, right? Yes, yes. And he says he proposed a commission schedule that will be different. It won't have offset of PIC rejects. Now, I assume he didn't mean – he wasn't just referring to PIC rejects where it wasn't verified in the first place. He's talking about ultimate PIC rejects. So we'd like to change our commission schedule. We'll take a lower commission and blah, blah, blah, right? So it sounds like he's acknowledging that that's how they were playing the game at that time. Your Honor, again, I don't believe that he was acknowledging that. I mean, certainly it can be read both ways. I think what he is saying – Okay, if it can be read both ways, isn't school out because the district court didn't read it your way? We're just reviewing for clear error, aren't we? Clearly erroneous? Well, actually – If you say it can be read both ways, it can't be clearly erroneous to read it the other way, can it? No, but I'm not arguing that that determination based on that letter was clearly erroneous. What I'm arguing is that the interpretation of this agreement, irrespective of what the parties subsequently said and subsequent communications or actions taken while they were in an economic situation where they had to do so, does not change the interpretation of the agreement at the up front. Whatever the parties did after the fact, and whether it was by economic duress or otherwise, they did – that did not dictate what the contract said when the agreement started. Was there ever a protest letter saying, well, this is not what we agreed to? There was, Your Honor. When was that? Was that before or after Yamashita? It was before in May of – late May. Mr. Harwood sent an e-mail, actually two e-mails, to Sue Blanchet. And they are in the record. I'll get the site for those in just a moment, Your Honor. 2001. Is that the month before? Yes, 2001 was the operative time frame. We were only in that time frame. But Mr. Harwood didn't have any idea what the contract said. You told me that. Mr. Harwood wrote the objection letter. He was the individual who was invoicing. Why are we being asked to include pick rejects that didn't switch when that isn't what we were supposed to include? But he didn't know. He had no clue what the contract said, right? He was instructed to write the letter. I believe it was his testimony. And the question I thought that was posed to me was whether or not there was ever an objection stated. And it was. And it was stated at that time, A, we don't believe we're responsible for these chargebacks. B, there's nothing in the agreement that says you can charge us back. And C, we've already paid the money out to our call centers, and we're out of business if you charge us back for all these. How do we work it out? And the result was, well, we're going to charge you back for them anyway, or you're not going to get paid. And what we'll allow you to do is stretch it out over the course of the balance of the contract. And at that juncture, Alliance, in fact, accepted that and tried to go on with the program. That is what happened. In any event, it looks like I'm down to a minute and 30 seconds that I've left for rebuttal. If there's any further questions, I'd like to try to respond to those. The breach of the implied covenant of good faith is something that I also think the Court needs to look at. Although it's been thoroughly briefed, I do have a couple of comments on that. I'll reserve that for the final. Thank you. Thank you, Your Honor. Please. Good morning. My name is Philip Eskenazi, and I represent the Appellee AT&T Court. In following up on a question that you just asked about whether there was a protest letter, the record is clear that throughout the life of the party's contractual relationship up until the first day of litigation, they never contested that a line must switch for them to earn the commission. What they said in that letter of May 2001 was, wait a second. And they didn't acknowledge it. Wait a second. We understand that it must pick, confirm, or switch over. Where is your right to charge us back after you've already paid the commissions? And, in fact, something they've never acknowledged, that is right in the invoicing section, paragraph 26C, which is at ER page 47, where it expressly says, quote, payment of invoices shall not waive ACC's rights to inspect, test, or reject. And I submit that if you buy their position that AT&T did not have the right to reverse commissions, then you read that sentence out of the contract. Because what else could it mean if the payment does not waive your right to later reject it? How else could you later reject something that you've already paid? So the record is clear there. As far as coercion, I want to back up on that point. At ER page 203, the magistrate judge, who prepared, as you know, a 29-page order of findings of fact and conclusions of law, expressly stated in footnote 10, quote, plaintiff produced no evidence whatsoever at trial of explicit or implicit coercion by defendant. So I think that should put that issue at rest. I agree with his opening remarks. This is a straightforward case of contractual interpretation. I think that where we need to go is to the provision in the contract entitled commissions, and that is Exhibit B. And that is at ER 51. And there's two conditions set forth for them to earn a commission. Third-party verification and, quote, the customer has successfully been processed through PIC authorization procedures. And I think it's important to note that immediately prior to trial, the appellant stipulated that that phrase, successfully been processed through PIC authorization procedures, meant the line must switch to AT&T. That is at page 49 of the supplemental excerpts of record. And they say, quote, this is their opposition to a motion in limine. The parties do not dispute that, quote, PIC authorization procedures refers to a customer switching services to defendant. That was their submission prior to trial. Now, then in their trial brief, because they acknowledge that that's what that phrase meant, they argued that AT&T slipped that phrase in at the end of the negotiation. And certainly that was an admission that the line must switch. Otherwise, why would you argue at length that you never agreed to it? And for whatever reason, during trial, they came up with a new tact, which they advance in this appeal, and that is, no, in fact, this is consistent. Third-party verification and this second phrase merely means that AT&T needs to accept the orders from the telemarketing company. I submit that is not what this phrase says on its face. No one at trial testified to that effect. The two people that negotiated the contract for the appellant did not testify at trial. The individual who negotiated the contract for AT&T, Linda Statmuller, did testify at trial. She testified unequivocally that that phrase meant that the line must switch. It was a commission. If the line doesn't switch, there's no sale, no sale, no commission. They were looking to buy customers. We had an industry expert testify. She also testified that that phrase, as she understood it, having worked in the industry for some 30 years, meant that the line must switch to AT&T. But nobody defined it in the contract. Nobody defined it in the contract. They now seize on to paragraph 2A. Paragraph 2A does not say that. If you turn to paragraph 2A, which is ER page 41, that does have a defined phrase, pick authorization. But that's a defined term with authorization as a capital A. If you look in Exhibit B, as they use pick authorization, the A in authorization is not capitalized. So it's not even clear from the face of the document whether the two provisions are talking about the same thing. And then if you read paragraph 2A, I submit that that does not say on its face AT&T's acceptance of orders. There's two conditions there. First, all federal, state, and local laws and regulations relating thereto. And then the second condition is AT&T's procedures, which collectively shall mean this defined term, pick authorization. So on its face, it means something more than AT&T's procedures. And then as far as AT&T's procedures, we don't even know what that means on its face. That certainly could mean a lot more than simply accepting orders from the telemarketer. Once again, the only person we heard from at trial was the person who negotiated the contract on behalf of AT&T, and she absolutely rejected plaintiff's contention, the appellant, excuse me, the appellant's contention that this somehow meant acceptance of orders. It was just stated that Mr. Harwood said that that meant they weren't accepted because there were no local lines available. Your Honor, that's not true. There were three different types of lines that were being sold here. Long distance, something called LATA, which is like regional calls, and local. And they were to get paid commission, $35 for each of these lines. And the standard was the same for all three. There's no distinction. And they submitted orders for all three lines. They were paid commissions for all three types of lines. All three types of lines were rejected in many instances for a number of reasons. So, no, it's not true that just local. Give me an example of why they were rejected. You may place on your phone a block because we had, you know, an incidence of slamming was a prevailing thing where people would switch. One day you think you have AT&T, and the next day you have Sprint. So because people, unscrupulous people, could switch your phone line. So now it's set up that we all have the right to call our local exchange company and put a block on our calls. That means unless I personally or you personally call and remove that block, even if another phone carrier like AT&T says, I have Mr. Eskenazi's authorization to change his line and it was third-party verified and the local exchange company will run it through its records, it will reject it. And it will send back to AT&T a PIC reject. It's in the record that there's about a thousand different reasons. That is certainly one. I think that's actually the most prevailing one. There could be another one, as they just noted, for local lines. Maybe for whatever reason the local phone company doesn't operate. You can't have that carrier on a certain street. I know that was one of the things that the expert testified at trial. The phone lines, it might be a rural area. It's just not set up for it. Or people might get tired pushing this button and waiting, pushing another one, listening to music. That could well be one of the thousand reasons. That's right. If you want to change something, it takes you two hours to do it. So you give up. I don't dispute that. Here, the contract. We could debate whether the contract on its face unequivocally said that the line must switch. I think his burden and his argument is that on its face, it clearly says that they get paid a commission based on third-party verification and AT&T's acceptance of the orders. And I submit that is not clear on its face. And more importantly, that is not supported by any of the extrinsic evidence. And a magistrate – let's remember, they moved for summary judgment. And in moving for summary judgment, they made the same – well, actually, they didn't make this argument. They made a different argument that the contract was unambiguous on its face and that they were supposed to get paid based just on third-party verification. And the district judge said that based on the submissions by the parties, there appears to be a conflict in the extrinsic evidence. I cannot tell which provision controls, so we're holding this case over for trial. A trial was held before a magistrate judge. He heard three days of testimony and witnesses, reviewed all the exhibits, made factual findings, weighed credibility, and concluded that the parties intended and agreed, as evidenced by their subsequent course of conduct, that appellant would only receive commissions for lines that switched. And I think the record is also replete with admissions by them, both throughout the litigation and during trial. And they're set forth in the record. On this question of breach of the implied covenant of good faith and fair dealing that the court found that you did not breach that, is that a question of fact or is that a legal question? I think that's a question of fact subject to a clearly erroneous standard. What the judge held was AT&T believed it had certain rights under the contract and it acted in good faith in accordance with those rights. I think if someone were to ultimately say, no, AT&T did not have those rights, that doesn't change the factual finding that AT&T believed it had certain rights and acted in good faith. Okay. So that question involved those later sales that AT&T didn't honor because they told them to ramp it down? There was an express agreement to ramp down and they actually ramped up significantly. I'm not sure how important it was to the panel, but there was a representation made that these notations of pick rejects on the invoices, which we submit and which the magistrate judge expressly found, evidenced the party's understanding that if a line didn't switch, AT&T had the right to charge back. And there was just a representation made that somehow the pick rejects referred to AT&T's reject on the front end. And there was a statement made that Mr. Harwood testified to that. Mr. Harwood did not testify to that. Mr. Harwood's testimony, which they put in in the amended appellant supplemental excerpts of record, ASER, at 15 through 21, Mr. Harwood actually said that what he did was he would submit to AT&T all of the lines which they believe were third-party verified. Then AT&T would run its own internal processes and determine which of those it would accept. And the reason being, let's say they got a number 1111111. That was clearly something they were going to reject. So that was kind of the internal protocol that went on at AT&T. Then they would tell Mr. Harwood how many lines were accepted. Then he would prepare his invoice. So his invoice was already net of AT&T rejects. Then the second line for pick rejects, Mr. Harwood testified that that was something else. And he said, I believe he ultimately conceded that that meant the line didn't switch. At best, he said, I'm not sure what that meant. He absolutely did not say that that line meant AT&T rejects. I'm comfortable submitting on the record at this point, unless Your Honors have any questions for me. All right. Thank you. Thank you, Your Honors. I would like to just deal briefly and quickly with a couple of the questions. Your Honor, the reasons for the pick rejects are specifically set forth in a report at ER page 99 through 100. There are not 1,000 reasons. There are specific reasons. They include, for example, out of local service footprint, which was 22% of what was rejected, meaning it's out of the footprint that AT&T could service. There was customer changes business plans. Customer decided not to accept service. These are the reasons that are set forth at ER page 99 through 100. The trial court noted these were all reasons that were completely unassociated with Alliance. We have no control over that. The question about what Mr. Harwood did or didn't say is at supplemental excerpt of the record, appellant supplemental excerpt, page 18. Mr. Harwood does say that he put those in there because they were upfront rejects. I'm interested when counsel stands up and says that I stipulated to a contrary interpretation. I never so stipulated. I never would have so stipulated, or this case wouldn't have gone to trial. The opposition to a motion in limine that was filed with the court eight months before we actually got out the door to go to trial doesn't say that PIC authorization procedures means switch. It says refers to. And if you look in Black's Law Dictionary, Black's Law Dictionary contains a definition for refers, which doesn't mean mean. It refers to, it makes reference to, it points to another area where you get the information from to fill in the blank. I didn't say it meant that. If I said it meant that, then the case would have been over before I walked in the door. Harwood's objection is in two emails at ER page 79 and ER page 80. And in sum, my problem here is that the court below never made a finding of ambiguity. The court didn't say this contract is ambiguous, and I don't know what it says. The court said at first blush it appears to be ambiguous. It analyzed the two parties' respective interpretations and accepted AT&T's. And that's why I say there's been no finding of ambiguity, and the court should not have been looking at subsequent conduct of the parties to interpret the agreement. If the agreement, interesting thing in this case is we've all cited the same law, both the court below, both my opponent and myself. The same case, the law is not in dispute. If the agreement says something, the court is bound to interpret it as the parties intended it. I can see no dispute in how the parties defined PIC, PIC. Paragraph 2A says PIC means preferred inter-exchange carrier. It says that, preferred primary inter-exchange carrier. I'm sorry. Lastly, if that was indeed true, how was it that alliance was to be paid for local lines when every witness at trial specifically testified local lines do not go through a PIC process? They don't go through a PIC process. If they don't go through a PIC process, how can successful completion of PIC authorization procedures bar recovery for those? They don't go through the process. And that was 19,916 lines. That was $690,000 to this small company. My closing remark is this, Your Honors. When a small company like alliance enters into a contract with a larger company, it is indeed a slippery slope, and they have but one thing to maintain their traction, and that is their written agreement. And the written agreement, while it may not be perfect, is what it is. And the only thing that that small company can rely on is that the party is going to be bound to the agreement, which, by the way, they drafted and we signed. And now we're being denied the contractual benefit that we agreed to. And I would respectfully ask this Court to reverse the trial court's decision below on the interpretation of the agreement, find that alliance was entitled to its sales based on third-party verification and submission of the data to AT&T, irrespective of whether alliance switched. And I thank you very much for the opportunity to present my case. Thank you very much. And this matter is submitted, and the Court will recess until 9 a.m. tomorrow morning.
judges: Pregerson, Fernandez, Siler